UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

DR. A. P. SORIANO,                                                    PLAINTIFF

VS.                                        CIVIL ACTION NO.  4:08CV68-HTW-LRA

NESHOBA COUNTY, MISSISSIPPI
BOARD OF SUPERVISORS, et al.                                      DEFENDANTS

_____

## MEMORANDUM OPINION AND ORDER
_____

Before this court are the following motions: a motion for summary judgment filed by defendants Neshoba County General Hospital ("NCGH"), NCGH Board of Trustees, NCGH Medical Staff Executive Committee, NCGH Appeals Committee of the Medical Staff, Karen Fiducia, Beth Burns, Walter Willis, M.D., Andrew P. Dabbs, M.D., John Mann, M.D., and Quorum Health Resources, LLC ("Quorum") [docket # 195];   a motion to strike response to the summary judgment motion, also filed by the above defendants [docket # 206];   a motion for entry of default against Jeffery Todd Willis filed by plaintiff, A.P. Soriano [docket # 21];   and a motion to set aside default filed by Jeffery Todd Willis [docket # 24].

The plaintiff, Dr. A. P. Soriano, filed this action on June 26, 2008, against the above named defendants.  On July 24, 2009, the defendants moved for summary judgment, said motion having been filed pursuant to Rules 56(b) and (c), Federal Rules of Civil Procedure.[1]  On

_____

[1]Rule 56 reads in pertinent part:

(b) By a Defending Party. A party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or part of the claim.

1

September 23, 2009, this court heard oral arguments from all of the parties, on all of the motions and determined the following:  (1) plaintiff's motion for entry of default against Jeffery Todd Willis was withdrawn, mooting the (2) motion of Jeffery Todd Willis to set aside default;  (3) defendants' emergency motion to strike response to summary judgment motion was denied;  and (4) defendants' motion for summary judgment was granted in all respects.  Below, this court sets out its reasons for granting defendants' motion for summary judgment.

Dr. Soriano filed this action on or about June 26, 2008, against the above-named defendants after his admitting privileges had been revoked by the hospital.  In particular, he alleges that the defendants: (a) violated his constitutional rights to procedural and substantive due process;  (b) discriminated against him on the basis of his national origin from the Philippines; (c) discriminated against him because of his age, which was about sixty-seven (67) at the time of the revocation;  (d) discriminated against him on the basis of his race (although this was not specifically alleged in his complaint);  (e) tortiously interfered with his right to practice medicine;  and (f) defamed him about the revocation in a submission NCGH was required to make to the National Practitioner's Data Bank.

Age and national origin discrimination  are condemned by the federal protective statutes

---

(c) Time for a Motion, Response, and Reply; Proceedings.

. . . .

(2) The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

of Title 29 U.S.C. § 623[2] and Title 42 U.S.C. § 2000e-2(a),[3] respectively.  Accordingly, this federal court has subject matter jurisdiction pursuant to Title 28 U.S.C. § 1331.[4]

## I. <u>Allegations in the Complaint</u>

The backdrop for plaintiff's lawsuit as discussed in his complaint is as follows:  plaintiff was and is a medical doctor duly licensed to practice medicine in the State of Mississippi.  He has been actively engaged in a private medical practice in Neshoba County, Mississippi, by maintaining a private clinic there since 1974.  During this time, plaintiff had full medical staff privileges, both admitting and treating, at Neshoba County General Hospital.

On or about the morning of June 5, 2007, an African American/black female patient presented at the emergency room of Neshoba County General Hospital complaining of chest

---

[2]Section 623 states in pertinent part:

(a) Employer practices. It shall be unlawful for an employer--
   (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
   (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
   (3) to reduce the wage rate of any employee in order to comply with this Act.

[3] Section 2000e-2 reads in pertinent part:

(a) Employer practices. It shall be an unlawful employment practice for an employer--
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[4]Section 1331 reads: The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

3

pains.  The patient was admitted under the care of Dr. Venkat Yedlapalli, the Hospitalist on the

staff of Neshoba General.  A conflict arose between this doctor and the patient, resulting in the

patient requesting the services of plaintiff, Dr. A.P. Soriano.  The patient thereafter was

transferred to the care of Dr. Soriano.  Dr. Soriano treated the patient, but this treatment was

criticized by the Director of Nursing, Beth Burns, R.N.  The patient was transferred to the care of

Dr. Todd Willis and then, eventually, transferred to a cardiologist in Jackson, Mississippi, by Dr.

Todd Willis and Nurse Beth Burns.

Later, the Interim Administrator of the Neshoba County General Hospital, Karen Fiducia,

requested an investigation into the care Dr. Soriano had provided to the patient.  The Executive

Committee of the Medical Staff received the complaint and initiated an investigation.  A hearing

was had.  Dr. Soriano was invited to attend and did attend.  He brought a lawyer with him.

Following the meeting, the Executive Committee voted to revoke Dr. Soriano's admitting

privileges.  The Neshoba County General Hospital Board of Trustees, allegedly acting on the

medical advice and direction of the Medical Staff Executive Committee and the recommendation

of Quorum Medical Resources, LLC, voted to affirm the recommendation concerning the

admitting privileges of Dr. Soriano.

Dr. Soriano quarrels with this determination.  He contends that it was unwarranted on the

facts and the product of bias.  He has been a continuous critic of the policies of the hospital, he

says,  and that this measure was designed to quiet his criticisms.  He further contends that this

outcome evidences disparate treatment against him based upon his national origin and age.

Dr. Soriano seeks the following relief:   full restoration of all of his hospital privileges at

Neshoba County General Hospital;   a full retraction and withdrawal of all reports made to the

National Practitioner's Data Bank with regard to medical staff privileges;   monetary damages, including compensatory and punitive damages of Three Million Dollars;   and attorney fees and costs.

## II. <u>Summary Judgment Standard</u>

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment should be entered when the evidence before the court reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.  When such contradictory facts exist, the court may "not make credibility determinations or weigh the

evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

### III.  <u>Analysis</u>

### A.  Procedural Due Process

The plaintiff contends he was denied procedural due process.  To prove such a claim, a plaintiff must establish by a preponderance of the evidence the following: that (1) he was deprived of a life, liberty, or property interest (2) without the process that was due. *Saucedo-Falls v. Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. 2008) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 & n.3, 542 (1985)).

The facts are as follows.  Soon after being admitted, the patient (hereinafter referred to as Ms. Doe) requested to be transferred to the care of Dr. Soriano, who had treated her in his clinic on at least one occasion.  Dr. Soriano agreed to take over her care.  At that time, he determined that she was not symptomatic.

Throughout the night, blood tests were performed on Ms. Doe to determine her "Troponin I" levels.  Troponin I is a chemical that is found in the cardiac muscle complex, and an increase in this enzyme is a marker for myocardial necrosis or of cardiac muscle damage.  In fact, elevated Troponin in the presence of sustained chest pain has a positive predicted value of over 90 percent in a myocardial infarction (e.i., heart attack).  Ms. Doe's levels upon admission to the hospital were within the normal level; however, as the night progressed, they continued to rise.  The nurses on duty were highly concerned about this rise in Troponin levels, along with her earlier complaints of chest and arm pain, and they called Dr. Soriano several times throughout the night to advise him of the increase.

The rise in Troponin levels, along with the other physical symptoms reported by Ms. Doe, were highly indicative of a very serious problem. The nurses knew this, and they all anticipated that, because NCGH and the town of Philadelphia had no cardiology specialists, Dr. Soriano would order that Ms. Doe be transferred immediately to the care of a cardiologist for a cardiolgy consult, which was and still is the normal procedure in such cases. For that reason, they began preparing the necessary paperwork for such a transfer during the night, anticipating that the order would be coming momentarily from Dr. Soriano. However, it never came during the night.

Despite these dangerous test results, Dr. Soriano ordered that a nurse should consult with Dr. Yedlapalli and consult with a cardiologist in the "a.m." This is not something a nurse could do, i.e., call a cardiologist for a consult, as none was in Philadelphia. The staff at the hospital was very concerned that Ms. Doe would have a heart attack, and they would have done nothing to have her seen by a specialist. They said they did not ask Dr. Soriano to come in during the night, because that was not their role to tell a physician what to do.

The nurses' concern increased to the point that the RN in charge of Ms. Doe's care contacted her supervisor, the Assistant Director of Nursing, Beth Burns, RN, to advise her of the situation. Ms. Burns contacted Dr. Todd Willis, whom she believed to be on call for Dr. Soriano at that time.[5] Dr. Willis came to the hospital to examine Ms. Doe, and he initiated her transfer to the care of Dr. Harkins, a cardiologist at the Mississippi Baptist Medical Center. Dr. Willis did this because of her elevated Troponin and complaints of chest pain. He did not call Dr. Soriano prior to transferring Ms. Doe, but he did order a nurse to call Dr. Soriano to advise him that he

---

[5] Dr. Willis testified that he knew Ms. Burns called him between 5:30 and 7:30 a.m., because he was at the gym at that time.

was seeing Ms. Doe.  The nurse did this, and Dr. Soriano told her that this was okay with him.

Karen Fiducia was an employee of Quorum, which had a contract to manage NCGH.  Ms. Fiducia, as Acting CEO, filed a complaint seeking an investigation into possible corrective action against Dr. Soriano, pursuant to the Medical Staff By-Laws of the NCGH Medical Staff.  The procedures dictated in the By-Laws for situation such as this are, in pertinent part, as follows:

1.    Whenever the professional conduct of any practitioner is considered to be lower than the standard or aims of the Medical Staff, corrective action may be requested to the Executive Committee by any chairman of any standing committee of the Medical Staff, by the Chief Executive Officer, or by the Governing Board.

2.    The Chief of Staff must appoint an ad hoc investigatory committee consisting of three medical staff members to investigate the matter.

3.    Within thirty (30) days after being appointed, the investigatory committee must make a report of its investigation to the Executive Committee.  Prior to this report, the person against whom the complaint has been made has the right to meet with the committee and discuss, explain or refute the charges against him.  This interview "shall not constitute a hearing, shall be preliminary in nature, and none of the procedural rules provided in this bylaws with respect to hearings shall apply thereto."

4.    Within thirty (30) days of receiving the investigatory report, the Executive Committee may take a number of different actions, which can include, but not be limited to, "recommending reduction, suspension or revocation of clinical privileges."  The CEO is responsible for giving the practitioner notice of the

recommendation of the Executive Committee, and advising him of his right within thirty (30) days to request a hearing or an appellate review.

5.      Within five (5) days after receipt of a request for a hearing, the Chief of the Medical Staff or the Governing Board, must schedule and arrange for such a hearing and must, through the CEO, notify the practitioner of the time, place and date scheduled.  The Appeals Committee must be composed of not less than three members of the Medical Staff appointed by the Chief of Staff, with one being appointed Chairman.  A record must be kept of the hearing, and this can be done by a court reporter.  The practitioner must be present, and both the practitioner and the Executive Committee may be represented by counsel.  Each party has the right to present relevant information, call and examine witnesses, introduce written evidence, cross-examine witnesses, rebut evidence, and submit written memoranda of the close of the hearing.  Within fifteen (15) days after the final adjournment of the hearing, the hearing committee must make a written report and recommendation, and must forward that to the Executive Committee.  The report must recommend confirmation, modification, or rejection of the original adverse recommendation of the Executive Committee.

6.      Within thirty (30) days after receipt of notice by an affected practitioner of an adverse decision, he may notify the Governing Board of the hospital of his request for an appellate review by the Board.  Within five (5) days thereafter, the Governing Board must schedule a date for such review, which must not be less than thirty (30) days from the date of the request.  The practitioner may submit a

written statement to the Governing Board.  The Appellate Review Committee of

the Governing Board will have ten days after the review to issue a decision

affirming, modifying or reversing the decision below, and it must send this

decision to the Governing Board.  Within forty-five (45) days of conclusion of the

appellate review, the Governing Board must make a final decision in the matter,

and must send notice thereof to the Medical Staff and the affected practitioner.  If

its decision is in accordance with the Medical Staff's last recommendation, it will

be immediately effective and final.

7.    If the final action taken adversely affects the clinical privileges of a staff member

for more than thirty (30) days, the Executive Committee of the Medical Staff must

report to the Medical Licensure Board in accordance with the rules set forth in the

Health Care Quality Improvement Act of 1986, the information required to be

reported by said Act.  Even apart from that reporting requirement, all matters

required by law to be reported must be reported by the responsible party.

Based on those requirements in the By-Laws, and after filing the complaint under her

authority as CEO, Ms. Fudicia met with Dr. Dabbs, the Chief of Staff, and the rest of the

Executive Committee, along with counsel for the hospital, Mark Caraway, to have Mr. Caraway

explain to them the necessary procedural steps to be taken under the By-Laws to process this

complaint.

Pursuant to those By-Laws, the Executive Committee appointed an investigating

committee to review Ms. Doe's medical chart, and to interview pertinent witnesses, including but

not limited to, Dr. Soriano.  The committee members were not instructed to provide an opinion,

10

only to undergo fact-finding and issue a report.  The investigating committee consisted of Dr. Mann, Dr. Naguib and Dr. Fairchild.  At the end of this process, the investigating committee met with the Executive Committee to inform it of their individual findings.[6]

The Executive Committee then on its own thoroughly reviewed Ms. Doe's medical chart. Although not required to do so in the By-Laws, Dr. Soriano was asked to meet with the Executive Committee to provide his own explanation of why he treated Ms. Doe in the manner her did and why he did not immediately transfer her from NCGH for a cardiology consult based on her dangerously high Troponin levels.  This was not a hearing.  Dr. Soriano had access to Ms. Doe's medical chart for this meeting, but no lawyers were permitted to attend.

During the Executive Committee meeting, Dr. Soriano told the physician committee members that he believed that he met the appropriate standard of care in treating Ms. Doe, despite the fact that her Troponin levels had increased dramatically during the night.  He defended his action by stating that he made his judgment based on her other clinical symptoms. Dr. Soriano admitted that he was fully aware that elevated Troponin levels were a very common indicator of myocardial necrosis or cardiac muscle damage.  Nonetheless, Dr. Soriano informed them that, even being aware of that fact, he would take the same actions today if confronted with similar facts with another patient.

Dr. Dabbs informed Ms. Fiducia of their recommendation by letter dated September 17, 2007, who then advised Dr. Soriano.

---

[6] Dr. Soriano has complained that he was not allowed to see a copy of Ms. Doe's chart during the investigatory phase. The defendants dispute this fact.  However, that dispute is not material as he has admitted that, although he did not have the chart in front of him at that time, he is not aware of anything that he told the committee that was not accurate in the chart.  Moreover, he admits that he had the chart, or a copy of the chart, at all other stages of the peer review process.

Dr. Soriano appealed this decision pursuant to the By-Laws, at which point Dr. Dabbs appointed an appeals committee consisting of the Chair, Dr. Walter Willis (department head of the ER, and no relation to Dr. Todd Willis), Dr. Nanney and Dr. Lucas, all of whom were non-competitors with Dr. Soriano. The Appeals Committee presided over a hearing on the issue of the Executive Committee's recommendation.

Dr. Soriano appeared, along with other pertinent witnesses such as Dr. Todd Willis and the nurses involved in the care of Ms. Doe. Dr. Soriano had Ms. Doe's chart available to him and he had two attorneys present representing him. Dr. Soriano was permitted to testify and even personally to ask questions of the witnesses. Likewise, his attorneys were permitted to cross examine the witnesses.

As before the Executive Committee, Dr. Soriano testified that he would take the same action if confronted with a like situation in the future, even knowing that the elevated Troponin levels were related to myocardial heart tissue damage.[7] The Appeals Committee voted unanimously to uphold the Executive Committee's decision to revoke Dr. Soriano's admitting privileges to the hospital.

Finally, pursuant to the By-Laws, Dr. Soriano had the right to and did appeal this decision to the hospital Board of Trustees, which affirmed the decision of the Medical Staff. As a result, Dr. Soriano's admitting privileges were officially revoked effective February 18, 2008.

This court is persuaded as follows. The Medical Staff By-Laws of the Neshoba County General Hospital afforded the plaintiff with a procedural network to review and grieve the

---

[7] Dr. Walt Willis testified that when Ms. Doe's enzymes went up, it was time to transfer her then, and not wait for a cardiology consult the next morning.

revocation of his admitting privileges from that hospital.  The plaintiff took advantage of the procedures that were provided, including but not limited to being represented by counsel, and being able to call witnesses at the hearings provided to him by the Medical Staff to review the revocation decision.  Although the plaintiff alleges that the By-Laws were not followed in all particulars, the court finds that the hospital substantially complied with those By-Laws and that the plaintiff has demonstrated no injury from any deviation.  The procedures afforded to the plaintiff were fairly applied.  He was allowed to attend the hearing and even to bring his attorney. *See Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) ("Though the state must, for instance, accord a public employee 'some kind of hearing' before termination, this may consist of no more than a meeting at which the employer states the grounds for dismissal and gives the employee an opportunity for rebuttal.").

Dr. Soriano also alleges that he was denied procedural due process because Dr. Mann was on the investigatory committee and he had a prior misunderstanding with Dr. Mann.  Dr. Soriano claims that the doctors on the various peer review committees were in competition with him, determined to take away his patients and obtain additional revenue from the hospital.

The case of *Caine v. Hardy*, 943 F.2d 1406 (5th Cir. 1991), is instructive.  There the plaintiff doctor also alleged that he had been the victim of partisan decision-making.  The Court held that "this is a tolerable risk when compared with the state's powerful interest in protecting patient safety ... The state has no constitutional duty to provide a procedural regimen that guarantees faultless decision-making; the state's interests in safety and efficiency find expression in the tolerable level of risk."  *Id.* at 413.

Further, concerning Dr. Mann, he had no vote in the ultimate decision to revoke Dr.

13

Soriano's privileges since he only participated in the initial fact-finding.  Dr. Dabbs and Dr. Walter Willis, Chairman of the Executive Committee, and Chair of the Appeals Committee, respectively, both testified that they made their own independent review of the facts.  Dr. Willis stated that he did not even remember reviewing Dr. Mann's investigatory report.  This court then agrees with the defense that any presumed prejudice that Dr. Mann may have had against Dr. Soriano was thoroughly diluted by the multiple layers of additional review by physicians who had not had any prior disputes with Dr. Soriano.

### B.  Age and National Origin Discrimination

Plaintiff contends that he has been the victim of age and national origin discrimination. Jurisprudence in this area requires plaintiff to prove by a preponderance of the evidence the following with regard to age discrimination: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age. *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (quotations and citations omitted) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).

And, with regard to national origin discrimination, plaintiff must prove the following elements by a preponderance of the evidence: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) he was replaced by someone outside the protected class.  *Lopez v. Martinez*, 240 Fed. Appx. 648, 649 (5th Cir. 2007) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)).

14

A plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") before a court may consider his Title VII claims. *Preston v. Tex. Dep't of Family & Protective Servs.*, 222 Fed. Appx. 353, 356 (5th Cir. 2007). A Title VII plaintiff is not required to check a certain box or recite a specific incantation to exhaust his or her administrative remedies before the proper agency. *Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006). Nor must the plaintiff, for purposes of exhaustion, allege a prima facie case before the EEOC. *Id;* instead, the plaintiff's administrative charge will be read somewhat broadly, in a fact-specific inquiry into what EEOC investigations it can reasonably be expected to trigger. *Id.* The charge must contain an adequate factual basis putting the employer on notice of the existence and nature of the charges so that the EEOC may have an "opportunity to attempt to obtain voluntary compliance." *Preston v. Tex. Dep't of Family & Protective Servs.*, 222 Fed. Appx. 353, 356-357 (5th Cir. 2007).

The plaintiff failed to allege age and national origin discrimination in his Charge of Discrimination filed at the EEOC. The plaintiff checked the box for race but not for age or national origin. That alone is not enough to dismiss his claim; however, in addition to not checking the boxes for those claims, he failed to provide any information in his factual statement that would have given notice that he intended to bring claims for age and national origin discrimination.[8] *Preston v. Tex. Dep't of Family & Protective Servs.*, 222 Fed. Appx. 353, 357

---

[8]Plaintiff's factual statement states in entirety:

On February 18, 2008, my admitting privileges as a doctor have been revoked at the above hospital.

The Interim Administrator (White) lodged a complaint against me based on their (sic) findings of inadequate care of one patient.

15

(5th Cir. 2007) (In determining whether claims were raised, "[t]he crucial element of a charge of discrimination is the factual statement contained therein").  This failure foreclosed the possibility of the EEOC being able to investigate and conciliate the Charge, thus thwarting the process designed by Congress.  This failure is also fatal to plaintiff's current campaign; a failure to exhaust necessarily results in the court's obligation to dismiss the unexhausted Charge.

## C.  Race Discrimination

To prevail under this theory, plaintiff must establish the following by a preponderance of the evidence: 1) he belongs to a protected class; (2) he was qualified for the position he held prior to discharge; (3) he was discharged from that position; and (4) other similarly situated individuals who did not belong to the protected class were not discharged.  *Prejean v. Radiology Assocs. of Southwest La., Inc.*, 342 Fed. Appx. 946, 949 (5th Cir. 2009) (citing *Meinecke v. H & R Block Income Tax Sch.*, 66 F.3d 77, 83 (5th Cir. 1995)).

Plaintiff's only proof of race or national origin discrimination was one stray comment made by a physician on the Medical Staff's investigatory committee, whereby the physician

---

I believe that I am being discriminated against because of my race (Philippine) native (sic) in violation of title VII of the Civil Rights Act of 1964, as amended since:

The White physicians (Andy Dabbs and Todd Willis) are still full members of the medical staff and have made errors in medical treatment resulting in great harm and even death of a patient. The medical staff has never investigated a single one of these incidents even though everyone in the hospital was aware they occurred. Nor has the hospital administrator ever filed a complaint about the inadequate care of any of the White physicians.

The patient in question is still my patient in my private clinic and has suffered no damage due to my alleged poor care.

As of February 18, 2008, I was the last non-White citizen who was a member of the medical staff.

stated what the standard of care for particular patients was "in this country." Plaintiff seeks to

stretch this statement to manifest racial and/or national origin discrimination. This statement

simply does not rise to the level of proof necessary to prove discriminatory animus. *See, e.g.,*

*Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994) (granting of summary judgment

affirmed where religious discrimination claim was based on one colleague's statement of "Who

did she think she is," with regard to plaintiff's request for a special accommodation.).

      Dr. Soriano's race and national origin claims also suffer an additional flaw. Title VII

only prohibits discrimination by "employers" against their employees or applicants for

employment. *See Foley v. Univ. of Houston Sys.,* 355 F.3d 333, 340 n.8 (5th Cir. 2003). Dr.

Soriano has admitted in both written discovery responses and in his deposition that he was not an

employee of the hospital, Quorum, or any of the individually named defendants. *See Diggs v.*

*Harris Hospital-Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988), wherein the Court applied the

"economic realities/common law control test" to determine employment status of doctors.

      Dr. Soriano likewise cannot show a *prima facie* case on the basis of his circumstantial

evidence of discrimination. He claims he was treated differently from similar situated

individuals, namely, Dr. Dabbs and Dr. Todd Willis. He mentions various negative incidents he

attributes to them, which he says were never even investigated. The problem with this assertion

is that Dr. Soriano maintains these accusations based upon hearsay testimony. He admits that he

does not know first hand knowledge whether either incident was investigated or what the result

of any investigation might have been.

      An additional factor impacts Dr. Soriano's contention of "identical comparisons"

afforded by any circumstances pertaining to those two physicians. At his hearing during the peer

17

review process, Dr. Soriano emphatically stated that if confronted with the same situation as he encountered with patient Ms. Doe, he would take the same course of action.  He stated that if he had another patient under his care with the same symptoms as Ms. Doe he would behave the same.  The peer review committee found this response intolerable and calloused.

### D.  Section 1981

Dr. Soriano also claims that he was discriminated on the basis of his race pursuant to Title 42 U.S.C. § 1981 which prohibits discrimination in the making or enforcement or termination of contracts.  Dr. Soriano alleges in his "Amendment to Complaint" that he had a quasi-contract with the hospital that allowed him to admit patients to the hospital, use the facilities and allow the hospital to charge for the use of the facilities.

Dr. Soriano submitted this "Amendment" without leave of court.  Therefore, the court dismisses this Amendment.

Even so, Dr. Soriano admitted in his deposition that he did not have a contract of any kind with the hospital or any of the other defendants to this action.  Therefore, this court is persuaded that Dr. Soriano cannot state a claim for violation of Section 1981.

### E.  Defamation

Plaintiff accuses Neshoba County General Hospital with subjecting him to defamation by reporting the revocation of his admitting privileges to the National Practitioner's Data Bank. Defamation, to be proved by a preponderance of the evidence, requires the following under Mississippi law:

(1) a false and defamatory statement concerning plaintiff;

(2) unprivileged publication to third party;

18

(3) fault amounting at least to negligence on part of publisher;

(4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication.

*Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002) (citing *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998).

Neshoba County General Hospital was required by federal law to submit a report concerning the revocation of the plaintiff's admitting privileges to the National Practitioners Data Bank. *See* Title 42 U.S.C. § 11133.[9] The hospital thereby enjoyed a qualified privilege with respect to the content of what was reported. The case of *Johnson v. Spohn*, 334 Fed.Appx. 673 (5th Cir. 2009), provides valuable juridical insight. Dr. Johnson ("Johnson"), an African-American physician, had his admitting privileges at Christus Spohn Hospital ("Hospital")

---

[9]Section 11133 reads in pertinent part:

(a) Reporting by health care entities.
  (1) On physicians. Each health care entity which--
    (A) takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days;
    (B) accepts the surrender of clinical privileges of a physician--
      (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or
      (ii) in return for not conducting such an investigation or proceeding; or
    (C) in the case of such an entity which is a professional society, takes a professional review action which adversely affects the membership of a physician in the society, shall report to the Board of Medical Examiners, in accordance with section 424(a) [42 USCS § 1134(a)], the information described in paragraph (3).

. . . .

  (3) Information to be reported. The information to be reported under this subsection is--
    (A) the name of the physician or practitioner involved,
    (B) a description of the acts or omissions or other reasons for the action or, if known, for the surrender, and
    (C) such other information respecting the circumstances of the action or surrender as the Secretary deems appropriate.

suspended after the death of a patient under his care.  After a multi-step peer review and appeal process, the Hospital revoked Johnson's privileges completely.  Johnson filed suit against the Hospital and members of the peer review board asserting multiple state a federal claims including violation of antitrust laws, breach of contract, slander, libel, violation of his constitutional rights, and race discrimination under Title 42 U.S.C. § 1981.  *Id.* at 677.

The district court dismissed all claims except race discrimination based on the Hospital's immunity under the Health Care Quality Improvement Act. The district court granted summary judgment to the Hospital on the race discrimination claim finding that plaintiff had failed to create a material issue of fact as to whether the Hospital's reason for revoking his privileges was pretext for race discrimination.  *Id.* 677.

On appeal, the plaintiff argued that there were significant factual issues in dispute which barred summary judgment. The Fifth Circuit found that the purpose of immunity was to avoid the court substituting it's own judgment over that of health care professionals involved in the peer review process. Therefore, contested issues of fact did not defeat immunity.  The court carefully reviewed the record to determine if the process provided by the Hospital comported with the fairness standards of the Act and found all defendants were immune under HCQIA for all except the civil rights claims.

As to plaintiff's claims of race discrimination, the Fifth Circuit stated that the district court correctly applied the *McDonnell Douglas* burden-shifting framework.  The Fifth Circuit affirmed the district court's grant of summary judgment, despite sworn statements made by the chairman of one of the peer review boards which had the responsibility to make recommendations to the Board of Directors about suspending/revoking doctors' privileges that

Johnson would not have lost his privileges if he was white or Hispanic.  *Id.* at 687.

Convinced by jurisprudence relative to Section 11111, this court is persuaded that the

plaintiff *sub judice* has failed to overcome the privilege afforded by this section.[10]

### F.  Tortious Interference and Conspiracy

Plaintiff's claim that a conspiracy existed among the Neshoba County General Hospital

staff and employees and Dr. Todd Willis to "steal" a patient from the plaintiff, to tortiously

interfere with his right to practice medicine, has not been supported by any facts, as is required

---

[10] Title 42 U.S.C. §11111 provides in part:

(a) In general

  (1) Limitation on damages for professional review actions

If a professional review action (as defined in **section 11151(9)** of this title) of a professional review body meets all the standards specified in **section 11112(a)** of this title, except as provided in subsection (b) of this section--

  **(A)** the professional review body,

  **(B)** any person acting as a member or staff to the body,

  **(C)** any person under a contract or other formal agreement with the body, and

  **(D)** any person who participates with or assists the body with respect to the action,

shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, **42 U.S.C. 2000e, et seq.** and the Civil Rights Acts, **42 U.S.C. 1981, et seq.** Nothing in this paragraph shall prevent the United States or any Attorney General of a State from bringing an action, including an action under **section 15c of Title 15**, where such an action is otherwise authorized.

  (2) Protection for those providing information to professional review bodies

Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.

by Rule 56 of the Federal Rules of Civil Procedure.

Tortious interference under Mississippi law is found where: (1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); (4) actual damage and loss resulted.  *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 15-16 (Miss. 2007) (citing *MBF Corp. v. Century Business Comms., Inc.*, 663 So.2d 595, 598 (Miss. 1995)).  Plaintiff's claim is devoid of proof.

## IV.  Conclusions / Summary

Plaintiff has failed to raise a genuine issue of material fact to prove a constitutional violation of procedural or substantive due process, and defendants are entitled to judgment as a matter of law as to those claims.

Plaintiff has failed to exhaust his administrative remedies before the EEOC with regard to his age discrimination claim under the Age Discrimination in Employment Act, Title 29 U.S.C. § 621 *et seq.*, and his national origin discrimination claim filed pursuant to Title VII of the Civil Rights Act of 1964, Title 42 U.S.C.  § 2000e *et seq.,* and those claims are dismissed for lack of jurisdiction.

Plaintiff has failed to raise a genuine issue of material fact concerning race or national origin discrimination under Title 42 U.S.C.  § 1981, and defendants are entitled to judgment as a matter of law as to those claims.

Plaintiff has failed to raise a genuine issue of material fact to prove defamation under Mississippi law, and defendants are entitled to judgment as a matter of law concerning that

claim.

Plaintiff, as non-movant in this motion, has failed to raise a genuine issue of material fact to prove or support any of his claims, including, but not limited to, his claim for the tortious interference with business relations or "patient stealing," with admissible evidence as required by Rule 56 of the Federal Rules of Civil Procedure, and all claims asserted against all defendants in his lawsuit are hereby dismissed with prejudice.

IT IS THEREFORE, ORDERED AND ADJUDGED that the defendants' Motion for Summary Judgment is **granted**, and this lawsuit against all defendants is hereby dismissed with prejudice.  The court will enter a Final Judgment in accordance with the local rules.

SO ORDERED, this the 24th day of June, 2011.

**s/ HENRY T. WINGATE**

**UNITED STATES DISTRICT JUDGE**

Civil Action No. 4:08-cv-68 HTW-LRA
Memorandum Opinion and Order